IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| DANYETTE CALDWELL )<br>20321 Lindbergh Ave )<br>Euclid, OH 44119 )<br>    Plaintiff, )<br> )<br>   v. )<br> )<br>CHARTER COMMUNICATIONS, LLC )<br>7800 Crescent Executive Drive )<br>Charlotte, NC 28217 )<br> )<br> **Serve also:** )<br>CHARTER COMMUNICATIONS, )<br>LLC )<br>C/O CORPORATION SERVICE )<br>COMPANY )<br>2626 Glenwood Avenue, Suite 550 )<br>Raleigh, NC 27608 )<br> )<br> -and- )<br> )<br>CHARTER COMMUNICATIONS )<br>12405 Powerscourt Drive, Legal Dept )<br>St. Louis, MO 63131-3673 )<br> )<br>    Defendant. ) | **COMPLAINT FOR DAMAGES AND REINSTATEMENT**<br><br>**JURY DEMAND ENDORSED HEREIN** |

Plaintiff, Danyette Caldwell, by and through undersigned counsel, as his Complaint against Defendant, states and avers the following:

## PARTIES

1. Caldwell is a resident of the city of Euclid, county of Cuyahoga, state of Ohio.

2. Charter Communications, LLC ("Charter" or "Defendant") is a foreign limited liability company that operates a place of business located at 7800 Crescent Executive Drive, Charlotte, NC 28217.

3. Charter was at all times hereinafter mentioned an employer within the meaning of 42 U.S.C. 126 § 12101 *et seq*. and 29 U.S.C § 2601, *et seq*.

4. Charter was at all times hereinafter mentioned, a "person" within the meaning of 29 USC § 203(a); AND/OR an "employer" within the meaning of 29 USC § 2611(4)(A).

## JURISDICTION & VENUE

5. Charter hires citizens of the state of North Carolina, contracts with companies in North Carolina, and owns or rents property in North Carolina. As such, the exercise of personal jurisdiction over Charter comports with due process.

6. This cause of action arose from or relates to the contracts of Charter with North Carolina residents, thereby conferring specific jurisdiction over Charter.

7. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1341 inasmuch the matters in controversy are brought pursuant to Family and Medical Leave Act ("FMLA"), 29 U.S.C § 2601, *et seq.* and the Americans with Disabilities Act ("ADA"), 42 U.S.C. 126 § 12101 *et seq*.

8. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Caldwell's state law claims because those claims derive from a common nucleus of operative facts.

## VENUE

9. Venue is proper in this District because the wrongs herein alleged occurred in this District.

10. Within 180 days of the conduct alleged below, Caldwell filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 430-2025-00441 against Charter operating at 7800 Crescent Executive Drive, Charlotte, NC 28217.

2

Case 3:26-cv-00154    Document 1    Filed 02/26/26    Page 2 of 14

11. On or about November 28, 2025 the EEOC issued and mailed a Notice of Right to Sue letter to Caldwell regarding the Charges of Discrimination brought by Caldwell against Charter in EEOC Agency Charge No. 430-2025-00441.

12. Caldwell received her Right to Sue letter from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1) - which has been attached hereto as Plaintiff's Exhibit A.

13. Caldwell has filed this Complaint within 90 days of the issuance of the Notice of Right to Sue letter.

14. Caldwell has properly exhausted his administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

## FACTS

15. Caldwell is a former employee of Charter.

16. Charter hired Caldwell in or around 2019 as a Rep2, Spectrum Mobile ("Rep2").

17. Charter hired Caldwell as a result of Caldwell's skills and experience.

18. Caldwell was qualified for the Rep2 position as a result of her skills and experience.

19. Throughout Caldwell's time with Charter, Caldwell continued to be qualified for the Rep2 position by meeting Charter's legitimate expectations for her performance.

20. As a Rep2, Caldwell's job responsibilities included troubleshooting, activating, and resolving mobile customer technology and service issues.

21. As a Rep2, Caldwell's job responsibilities included repair, billing, and accounts management for mobile customer technology and service issues.

22. Caldwell's essential functions to perform her job included sitting, talking, listening, and typing.

23. Caldwell has major depressive episode, post traumatic stress disorder, and greater affective disorder. ("Caldwell's Disabilities")

24. Caldwell's Disabilities substantially limit Caldwell's major life functions, including sleeping, concentrating, caring for herself, and working.

25. Caldwell is disabled within the meaning of the ADA.

26. In the alternative, Charter perceived Caldwell as being disabled.

27. Despite this actual or perceived disabling condition, Caldwell was still able to perform the essential functions of her job.

28. At the outset of the Coronavirus ("COVID"), Caldwell began to work remotely.

29. Charter required all personnel who could work remotely to work remotely at the outset of COVID.

30. After COVID passed, Charter allowed employees to remain as remote workers if their regular performance numbers continued to be met.

31. Caldwell continued to meet her regular performance numbers at all relevant points herein referenced.

32. In or around August or September 2023, Caldwell requested FMLA leave to care for her son. ("Caldwell's First FMLA Leave")

33. Charter was, at all times hereinafter mentioned, engaged in commerce or in an industry or activity affecting commerce and employed 50 or more employees for each working day during each of 20 or more calendar work weeks in the current or preceding calendar year and therefore is an employer as defined in 29 U.S.C §2611(4).

34. At all times relevant herein, Caldwell was employed by Charter for at least 12 months and had at least 1,250 hours of service with Charter and therefore was an "eligible employee" under the FMLA, as that term is defined in 29 U.S.C. §2611(2)(A).

35. During all relevant times, Caldwell qualified for FMLA leave.

36. Caldwell placed Charter on notice of the need for medical leave.

37. Charter approved Caldwell's First FMLA Leave.

38. Shortly after Caldwell's First FMLA Leave, Caldwell was injured and required physical therapy for back pain.

39. Caldwell requested FMLA leave to recover from her injury. ("Caldwell's Second FMLA Leave")

40. Charter approved Caldwell's Second FMLA Leave.

41. Caldwell's last day of work was on November 28, 2023.

42. After Caldwell's Second FMLA Leave, Caldwell required leave relating to Caldwell's Disabilities.

43. In particular, Caldwell requested leave as an accommodation for Caldwell's Disabilities. ("Caldwell's First ADA Accommodations Request")

44. Caldwell's First ADA Accommodations Request was reasonable.

45. Caldwell's First ADA Accommodations Request did not cause an undue hardship on Defendant.

46. Charter granted Caldwell's First ADA Accommodation Request.

47. Caldwell's First ADA Accommodations Request granted leave starting after November 28, 2023.

48. Caldwell's First ADA Accommodations Request was renewed on December 1, 2023.

49. After 2024 began, Caldwell had recovered to the point that she attempted to return to work.

50. As a part of the regular course of business for accommodations, Charter will check in with individuals on leave once per three months.

51. On or about February 28, 2024, Joanne Stiver reached out to Caldwell.

52. Stiver was Caldwell's direct supervisor.

53. Stiver had the authority to hire, fire, or discipline employees.

54. Stiver had the authority to hire, fire, or discipline Caldwell.

55. Stiver had the authority to allow Caldwell to work remotely.

56. Stiver was aware that Caldwell was disabled.

57. Stiver perceived Caldwell to be disabled.

58. Stiver was familiar with Caldwell's First FMLA Leave.

59. Stiver was familiar with Caldwell's Second FMLA Leave.

60. Stiver was familiar with Caldwell's First ADA Accommodations Request.

61. Stiver was familiar with Caldwell's leaves and accommodations requests because Stiver was Caldwell's direct supervisor.

62. In the February 28 call, Stiver informed Caldwell that she would be required to return to work in person after her leave.

63. Caldwell had previously met all requirements to work remotely while working for Charter.

64. Caldwell continued to meet the requirements to work remotely while working for Charter.

65. Other, non-disabled peers were allowed to work remotely.

66. Charter did not have a legitimate performance reason to require Caldwell to return to work in person.

67. Stiver did not allow Caldwell to work remotely as a result of Caldwell's Disabilities.

68. Stiver did not allow Caldwell to work remotely as a result of Stiver's perception of Caldwell as disabled.

69. Stiver did not allow Caldwell to work remotely in retaliation for Caldwell's First FMLA Leave.

70. Stiver did not allow Caldwell to work remotely in retaliation for Caldwell's Second FMLA Leave.

71. Stiver did not allow Caldwell to work remotely in retaliation for Caldwell's First ADA Accommodations Request.

72. Caldwell reached out to attempt to return to work for Charter in or around March, 2024.

73. As part of Caldwell attempting to return to work, Caldwell requested accommodations for Caldwell's Disabilities. ("Caldwell's Return to Work Accommodations")

74. Caldwell's Return to Work Accommodations was made to Robin McKnight.

75. McKnight was a Human Resources Representative for Charter.

76. McKnight had the authority to grant Caldwell's Return to Work Accommodations.

77. McKnight and Caldwell regularly communicated throughout March to attempt to allow Caldwell to return to work.

78. Caldwell's Return to Work Accommodations requested remote work.

79. Caldwell's Return to Work Accommodations requested more frequent breaks.

80. Caldwell's Return to Work Accommodations requested to work five hours per day on a normal work day.

81. McKnight confirmed that Caldwell's Return to Work Accommodations requested remote work.

82. Caldwell's psychiatric provider confirmed that Caldwell's Return to Work Accommodations requested remote work.

83. Caldwell's Return to Work Accommodations were reasonable.

84. Caldwell's Return to Work Accommodations would not cause an undue hardship on Defendants.

85. Defendant did not determine if Caldwell's Return to Work Accommodations would cause an undue hardship.

86. Defendants have no contemporaneously created documents reflecting any effort to determine if Caldwell's Return to Work Accommodations would cause an undue hardship.

87. After the Accommodation Request, no one at Charter engaged in an interactive process to find a reasonable accommodation for Caldwell's Disabilities.

88. Charter did not allow Caldwell to return to work remotely.

89. Charter rejected Caldwell's Return to Work Accommodations on or about March 22, 2024.

90. Stiver rejected Caldwell's Return to Work Accommodations, on or about March 22, 2024.

91. After rejecting Caldwell's Return to Work Accommodations, Charter refused to engage in any discussions regarding Caldwell's ability to return to work remotely.

92. Charter purported to approve Caldwell's Return to Work Accommodations as it pertained to working five hours per day.

93. Charter purported to approve Caldwell's Return to Work Accommodations as it pertained to working with extra breaks.

94. Charter purported to require Caldwell to return to work on March 25, 2024.

95. Charter simultaneously required Caldwell to submit paperwork relating to working five hours per day by March 28, 2024 to allow Caldwell to return to work.

96. Caldwell attempted to comply with Charter's requirements to submit additional paperwork.

97. Caldwell continued to request the ability to work from home as an accommodation.

98. On or about March 29, 2024, Charter confirmed that it received the additional documentation requested and that no further documentation or information is needed at that time.

99. On or about March 28, 2024, Charter informed Caldwell that she was on an unapproved leave of absence and that she had to return to work on the next work day.

100. On or about March 28, 2024, Charter informed Caldwell that she was on an unapproved leave of absence and that she had to return to work on the next work day, despite Caldwell's pending accommodations request.

101. On or about April 2, 2024, Charter terminated Caldwell's employment.

102. On or about April 3, 2024, Charter sent Caldwell an approval letter stating that Caldwell was approved to a reduced work schedule starting March 25, 2024.

103. Charter sent several conflicting messages to Caldwell regarding her return to work.

104. Caldwell continuously expressed her desire to return to work for Charter.

105. Charter's purported reason for terminating Caldwell's employment was job abandonment.

106. Caldwell did not abandon her job.

107. Charter's purported reason for Caldwell's termination is pretext.

108. Charter's purported reason for Caldwell's termination is pretext for discrimination.

109. Charter's purported reason for Caldwell's termination is pretext for disability discrimination.

110. Charter's purported reason for Caldwell's termination is pretext for discrimination on the basis of its perception of Caldwell as disabled.

111. Charter's purported reason for Caldwell's termination is pretext for retaliation.

112. Charter's purported reason for Caldwell's termination is pretext for retaliation for Caldwell's First FMLA Leave.

113. Charter's purported reason for Caldwell's termination is pretext for retaliation for Caldwell's Second FMLA leave.

114. Charter's purported reason for Caldwell's termination is pretext for retaliation for Caldwell's First ADA Accommodations Request.

115. Charter's purported reason for Caldwell's termination is pretext for retaliation for Caldwell's Return to Work Accommodations request.

116. Defendant did not proffer a legitimate non-discriminatory reason for terminating Caldwell.

117. Upon information and belief, Caldwell's termination of employment, Defendants hired or retained an individual outside of Caldwell's protected class to replace Caldwell.

118. As a result of Defendant's conduct, Caldwell suffered, and will continue to suffer damages.

## COUNT I: <u>DISABILITY DISCRIMINATION</u>

119. Caldwell restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

120. Caldwell suffers from Caldwell's Disabilties.

121. Caldwell is disabled.

122. In the alternative, Charter perceived Caldwell as being disabled.

123. Caldwell's condition constituted a mental impairment.

124. Caldwell's Disabilities substantially impaired one or more of his major life activities including working.

125. Charter perceived Caldwell's condition to substantially impair one or more of his major life activities including working.

126. Charter treated Caldwell differently than other similarly-situated employees based on his disabling condition.

127. Charter treated Caldwell differently than other similarly-situated employees based on his perceived disabling condition.

128. On or about April 2, 2024, Defendant terminated Caldwell's employment without just cause.

129. Defendant terminated Caldwell's employment based her disability.

130. Defendant terminated Caldwell's employment based her perceived disability.

131. Charter violated The American with Disabilities Act (ADA).

132. As a direct and proximate result of Defendant's conduct, Caldwell suffered and will continue to suffer damages, including economic and emotional distress damages.

## COUNT II: DISABILITY DISCRIMINATION - FAILURE TO ACCOMODATE IN VIOLATION OF THE AMERICANS WITH DISABILITY ACT

133. Caldwell informed Charter of her disabling condition.

134. Caldwell requested accommodations from Charter to assist with her disabilities including moving to a different location.

135. Caldwell's requested accommodations were reasonable.

136. There was an accommodation available that would have been effective and would have not posed an undue hardship to Charter.

137. Charter failed to engage in the interactive process of determining whether Caldwell needed an accommodation.

138. Charter failed to provide an accommodation.

139. Charter violated The Americans with Disabilities Act (ADA) 42 U.S.C. 126 § 12101 et seq.

140. As a direct and proximate result of Charter's conduct, Caldwell suffered and will continue to suffer damages, including economic and emotional distress damages.

## COUNT III: RETALIATION IN VIOLATION OF THE ADA.

141. Caldwell restates each and every prior paragraph of this complaint, as if it were fully restated herein.

142. At all times during her employment at Charter, Caldwell was qualified for her position.

143. Caldwell engaged in protected activity when she requested and used accommodations.

144. Charter's actions were retaliatory in nature based on Caldwell's opposition to the unlawful discriminatory conduct.

145. Pursuant to 42 U.S.C. § 12101 et seq. it is an unlawful discriminatory practice discriminate against a person because they have engaged in a protected activity.

146. As a direct and proximate result of Charter's conduct, Caldwell suffered and will continue to suffer damages.

## COUNT IV: RETALIATION IN VIOLATION OF THE FMLA

147. Caldwell restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

148. During his employment, Caldwell utilized FMLA leave.

149. After Caldwell utilized his qualified FMLA leave, Defendants retaliated against him.

150. Defendants retaliated against Caldwell by terminating his employment.

151. Defendants willfully retaliated against Caldwell in violation of U.S.C. § 2615(a).

152. As a direct and proximate result of Defendants' wrongful conduct, Caldwell is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs, and reasonable attorney's fees.

## DEMAND FOR RELIEF

WHEREFORE, Danyette Caldwell demands from Defendant the following:

(a) Issue an order requiring Charter to restore Caldwell to one of the positions to which she was entitled by virtue of his application and qualifications, and expunge his personnel file of all negative documentation;

(b) An award against each Defendant of compensatory and monetary damages to compensate Caldwell for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $ 25,000 per claim to be proven at trial;

(c) An award of punitive damages against each Defendant in an amount in excess of $ 25,000;

(d) An award of reasonable attorneys' fees and non-taxable costs for Caldwell's claims as allowable under law;

(e) An award of the taxable costs of this action; and

(f) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

/s/ *Evan G. Gungor, Esq.*
Evan Gungor (60902)
**SPITZ, THE EMPLOYEE'S LAW FIRM**
5540 Centerview Drive
Suite 200B
Raleigh, NC 27606
Phone: (980) 332-4688
Fax:    (216) 291-5744
Email: evan.gungor@spitzlawfirm.com

*Attorneys For Plaintiff*
*Danyette Caldwell*

## JURY DEMAND

Plaintiff Danyette Caldwell demands a trial by jury by the maximum number of jurors permitted.

/s/ *Evan Gungor*
Evan G. Gungor, Esq. (60902)
